The order below is hereby signed.

Signed: February 18, 2010.



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In Re:                                    ]
                                          ]
                                          ]
    FRIENDSHIP HOUSE                      ]     Case No. 08-00434
    ASSOCIATION, INC.                     ]     (Chapter 11)
                                          ]
                          Debtor.         ]
                                          ]

## ORDER GRANTING EMERGENCY SUPPLEMENTAL
## MOTION FOR APPROVAL OF SALE OF REALTY, FREE AND CLEAR

Upon consideration of the Emergency Supplemental Motion for Approval of Sale, Free

and Clear ("Motion"), filed by Friendship House Association, Inc. ("Debtor"), the Court Finding

that good cause exists to grant the Motion, it is therefore

**ORDERED**, that the Motion be and the same hereby is **GRANTED**; and it is

369235.1

**FURTHER ORDERED** that the Debtor be and the same is hereby authorized to sell that certain real property ("Property") commonly known as 619 D Street, SE, Washington, DC, bearing the legal description of Square 875 and Lots 6, 36, 800, 801, 803 and 804, and totaling approximately 27,262 square feet (and the building located thereon totaling approximately 18,000 square feet), together with all other structures, fixtures and improvements located thereon, and such related personal property described in the Agreement of Sale, to Altus Realty Partners, LLC, for the price of $2,600,000.00, on the terms and condition set forth in the Agreement of Sale attached to this Order, free and clear of all liens, claims and encumbrances, with such liens, claims and encumbrances (other than those paid at closing, subject to dispute, if any), attaching to the proceeds of the sale of the Property in such priority, validity, amount, and enforceability as they each had prior to the sale of the Property; and it is

**FURTHER ORDERED** that the granting of the Motion and the authorization to sell the Property stated herein are conditioned upon UIP III Invest, LLC being paid in full at closing on the sale of the Property as to allowed claims or, as to any such claims which have not been allowed as of the closing, UIP III Invest, LLC shall be paid in full when such claims become allowed claims, and the granting of the Motion and the authorization to sell the Property herein are further conditioned upon the proceeds of the sale being sufficient to pay in full the aggregate value of all of liens, claims and encumbrances on the Property of all creditors.

**FURTHER ORDERED** that the Debtor be and the same hereby is authorized to take all actions necessary to consummate the sale of the Property approved herein.

**END OF ORDER**                                    *[signature appears above]*
                                                    S. MARTIN TEEL, JR.
                                                    U.S. BANKRUPTCY JUDGE

2

369235.1

Copies to:

Jeffrey M. Sherman
JACKSON & CAMPBELL, P.C.
1120 20th Street, NW
Suite 300 South
Washington, DC 20036

OFFICE OF THE U.S. TRUSTEE
115 South Union Street
Suite 210
Alexandria, Virginia 22314

Vincent Mark J. Policy, Esquire
Gregory T. DuMont
Greenstein, DeLorme & Luchs, P.C.
1620 Connecticut Avenue, N.W., Suite 900
Washington, D.C.  20036

369235.1

## AGREEMENT OF SALE

THIS **AGREEMENT OF SALE** (this "**Agreement**"), is made as of the ____ day of February, 2010 between **FRIENDSHIP HOUSE ASSOCIATION, INC.**("**Seller**") and **ALTUS REALTY PARTNERS, LLC**, a Virginia limited liability company ("**Buyer**").

## W I T N E S S E T H :

**WHEREAS**, Seller is the owner of the real property commonly known as 619 D Street, SE, Washington, DC, bearing the legal description of Square 875 and Lots 6, 36, 800, 801, 803 and 804, more particularly described in **Exhibit A** hereto and made a part hereof and totaling approximately 27,262 square feet (the "**Land**") and the building located thereon totaling approximately 18,000 square feet (the "**Building**") and all other structures, fixtures and improvements (the Building and such other structures, fixtures and improvements, hereinafter, the "**Improvements**") located on the Land (the Land and Improvements, together with the items described in paragraph 1(b), being hereinafter collectively referred to as the "**Property**"); and

**WHEREAS**, Seller desires to sell the Property to Buyer, and Buyer desires to purchase the Property from Seller, upon the terms and conditions set forth herein; and

**WHEREAS**, Seller is currently the subject of a Chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the District of Columbia (the "**Court**") stated as Case No. 08-00434 (SMT) (the "**Proceeding**"), and in connection therewith Seller shall petition the Court to approve this Agreement and the sale contemplated hereunder pursuant to a Consent Order to be issued by the Court, a copy of which shall be attached hereto as **Exhibit D** upon issuance.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    Sale and Purchase.

     (a)    Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, the Property.

     (b)    The sale and purchase shall include all right, title and interest of Seller, if any, in and to:

     (i)    all transferable easements, development rights, covenants, tenements, hereditaments and appurtenances thereto belonging or appertaining thereto and, without limiting the generality thereof, Seller's rights, easements or other interest, if any, in walls, sidewalks or other property abutting the said real property; all heating, cooling, plumbing, electrical and other mechanical equipment; improvements contained in or on the said real estate; any rights to the name "Maples", and all equipment presently on said real property which is used in the operation and maintenance of the Property; all architectural and engineering documents and work product relating to such documents, to the extent the same are in the possession of Seller, and all permits, warranties and approvals, associated with the Property, except as otherwise provided herein; and

(ii)    All of the items of personal property listed on **Exhibit B** attached hereto, if any (such items being hereinafter collectively referred to as the "**Personal Property**").

2.    Purchase Price.

(a)    The purchase price ("**Purchase Price**") payable by Buyer for the sale of the Property shall be the sum of **Two Million  Six Hundred Thousand and 00/100's Dollars ($2,600,000)** subject to adjustments, credits and prorations as hereinafter provided, payable as follows:

(i)    Within three (3) business days after the Effective Date (as defined in Section 33 below), Buyer shall deliver to Old Republic National Commercial Title Services, 1667 K Street, N.W., Suite 610, Washington, DC 20006-1652 ("**Title Company**") to be held pursuant to the Escrow Agreement attached hereto as **Exhibit C**, the amount of **Eighty Five Thousand Dollars ($85,000)** in cash (said deposit together with any interest thereon, if any, shall hereinafter be called the "**Deposit**"); and

(ii)    The balance of the Purchase Price over and above the Deposit shall be paid to Seller in immediately available funds by certified check or wire transfer on the Closing Date (as hereinafter defined in Section 4) net of all prorations and other credits provided for in this Agreement.

3.    Due Diligence Period; Examination of Title.

3.1.    Due Diligence Period.

(a)    Buyer shall have until 5:00 p.m. est. on the thirtieth (30th) day following the Effective Date  (the "**Due Diligence Period**"), at its sole risk and expense, to conduct an inspection and examination of the Property and all matters (including environmental and land use matters) relating to the Property as Buyer shall require.  All inspection fees, appraisal fees, engineering fees, legal costs, and other expenses of any kind incurred by Buyer relating to such due diligence will be solely Buyer's expense.  Seller shall cooperate with Buyer in all reasonable respects at no cost to Seller.

(b)    Buyer agrees to indemnify, defend and hold harmless Seller and Seller's respective subsidiaries, affiliates, agents, officers, directors and employees (collectively, the "**Seller's Related Parties**"), from any claim, proceeding, suit, damage, liability, loss, cost, charge or expense or any other liability of every nature, kind and description whatsoever (including, without limitation, reasonable attorney's fees and expenses) incurred by or asserted against the Seller or Seller's Related Parties caused in whole or in part, and resulting directly from or arising from any negligent act done by Buyer or any of Buyer's contractors, subcontractors, licensees, invitees, agents or employees in connection with any due diligence tests, studies or other activities performed by or on behalf of Buyer in connection with Buyer's due diligence investigation of the Property. This indemnification shall survive the expiration of Buyer's Due Diligence Period and the termination of this Agreement, as well as the closing of the transactions contemplated hereby, for the applicable period of the statute of limitations.

2

(c)     In the event Buyer determines as a result of the foregoing due diligence that it does not desire to proceed with the purchase of the Property, Buyer may elect, in its sole discretion, to terminate this Agreement by delivering to Seller written notice of such termination prior to the expiration of the Due Diligence Period, whereupon the parties shall have no further rights or obligations hereunder, and Title Company shall promptly return the Deposit to Buyer. If Buyer fails to cancel this Agreement prior to the expiration of the Due Diligence Period or as otherwise permitted under this Agreement, then Buyer waives and gives up the right to cancel this Agreement under this Section 3.

(d)     Seller grants Buyer the right, at Buyer's own risk and expense, to enter upon the Property during the Due Diligence Period, for the purpose of making inspection surveys, studies, and environmental assessments of the Property which Buyer may deem necessary or advisable. Buyer shall use commercially reasonable efforts to cause minimum disturbance to the Property, and shall return the Property to the same condition that existed prior to such entry. Notwithstanding the foregoing, prior to entry upon the Property, Buyer shall obtain and shall cause its contractors to obtain commercial general liability and property damage insurance in commercially reasonable amounts insuring Buyer and Seller against any liability arising out of any entry or inspections of the Property pursuant to the provisions hereof. Buyer shall repair any damage to the Property caused by Buyer, its employees, agents and contractors with respect to such inspections, testing and inquiries.

(e)     Seller agrees to deliver to the Buyer within five (5) days from the Effective Date, all items in the Seller's possession related to the construction, operation, maintenance, occupancy and use of the Property, including and not limited to:

(i)      copies of the site plan, permits and construction drawings and as-built plans for the improvements on the Property as available, including all construction pricing;

(ii)     copies of all market and feasibility studies;

(iii)    copies of certificates of occupancy for the improvements on the Property;

(iv)     copies of all certificates of insurance for the Property;

(v)      copies of engineering reports, soil reports, environmental reports (including asbestos reports if any), any other professional reports or surveys in the possession of, or available to Seller;

(vi)     copies of current preliminary title reports or policies, including legible copies of all exceptions, and any surveys;

(vii)    copies of all property tax statements, existing assessments, bonds, impositions, and information on any contemplated future assessments to be levied against the property; and

DC1 30270710.2

(viii)   Other information that the Buyer may reasonably request (collectively, the "**Property Documents**").

3.2.    Title Examination.

(a)    During the Due Diligence Period, Buyer shall order and shall promptly deliver, when received, to Seller (i) a copy of a commitment ("**Title Commitment**") to issue an ALTA 2006 owner's title policy issued by the Title Company, or by such other reputable title company licensed to do business in the District of Columbia, which is reasonably satisfactory to Buyer and Seller, reflecting the status of title to the Land and Improvements; and (ii) a survey ("**Survey**") of the Land and Improvements, prepared by a District of Columbia licensed surveyor reasonably acceptable to Buyer, conforming to ALTA standards and otherwise in form sufficient to permit the issuance of a title insurance policy without standard exceptions regarding matters of survey. Buyer shall be solely responsible for the costs of obtaining the Survey and the Title Commitment and for the cost of obtaining any owner's title policy and any lender's title policy.

(b)    Buyer shall have until the expiration of the Due Diligence Period to notify Seller in writing of any reasonable objection (each a "**Title/Survey Objection**") which Buyer may have to any exception reported in the Title Commitment or with respect to any matter shown on the Survey. If Buyer fails to make any such Title/Survey Objection on or before the expiration of the Due Diligence Period, all items shown on the Title Commitment and Survey shall be deemed to be "**Permitted Exceptions**" and Buyer shall take title to the Property subject thereto.

(c)    Seller may, at its sole option, undertake to eliminate any Title/Survey Objection; provided, however, with respect to (i) any monetary lien or encumbrance that can be cured by payment of a liquidated sum, (ii) any and all matters related to the Proceeding, Seller shall be obligated to cure same in all events. If Seller elects to eliminate any such Title/Survey Objection, Seller may extend the Closing Date for an additional reasonable period of time, which period shall not exceed ten (10) days from the then existing Closing Date. If Seller is unable or does not desire to eliminate any one or more of such Title/Survey Objections, Seller shall so notify Buyer within five (5) days after Seller's receipt of Buyer's Title/Survey Objection notice. Upon receipt of such notice, Buyer shall have the option to either waive such matters in writing and consummate the transaction contemplated herein, or terminate this Agreement at any time within five (5) days after receipt of Seller's notice. If no election to terminate is made in writing by Buyer within such five (5) day period, Buyer shall be deemed to have waived all objections to such matters, and shall take title to the Property subject thereto.

(d)    In the event of termination under this Section, this Agreement shall be deemed null and void, Title Company shall promptly return the Deposit to Buyer and the parties hereto shall have no further obligations to or recourse against each other with regard to the matters provided for in this Agreement, except for rights and obligations which expressly survive the termination hereof.

4.    Closing Date; Condition Precedent.

4

The closing of the transactions contemplated hereby ("**Closing**") shall take place in escrow with the Title Company. The date of the Closing ("**Closing Date**") shall be on a date determined by Buyer, but, except as otherwise expressly set forth in this Agreement, in no event shall the Closing Date be later than fifteen (15) days after the expiration of the Due Diligence Period. Notwithstanding anything in this Agreement to the contrary, it shall be a condition precedent to Buyer's obligation to close that (i) Seller shall have performed all of its obligations under this Agreement in all material respects, (ii) that all of Seller's representations and warranties set forth in this Agreement are true, complete and correct in all material respects on the Effective Date and remain so on the Closing Date; (iii) from and after the expiration of the Due Diligence Period up to the Closing Date, there shall be no material adverse change in the condition of the structural elements of, or the mechanical, electrical, plumbing, heating, ventilating and air conditioning systems in, the improvements of the Property which remain unrepaired or unremediated at Closing, (iv) the Title Company is prepared to issue an ALTA 2006 owner's policy of title insurance at standard issue rates, with liability in the aggregate amount of the Purchase Price, insuring that fee simple title to the Property shall be vested in the Buyer, subject only to the Permitted Exceptions, and with no exception for the Bankruptcy Proceeding and (v) Seller shall have fully vacated the Property and there shall be no tenants, occupants or persons in possession of any portion of the Property. If any such conditions precedent are not satisfied on the Closing Date, Buyer shall be entitled to terminate this Agreement and receive a return of the Deposit.

    5.    <u>Intentionally Deleted.</u>

    6.    <u>Representations and Warranties of Seller.</u>

    (a)    Seller represents, warrants and agrees that:

    (i)    Seller is a corporation duly organized, validly existing and in good standing under the laws of the District of Columbia;

    (ii)    Seller is not a party to any pending action, proceeding or governmental investigation relating to the Property, other than the Proceeding.

    (iii)    There are no third party service maintenance or similar contracts related to the ownership, operation, maintenance or management of the Property currently in effect ("**Service Contracts**"). Seller shall indemnify Buyer against all costs due and owing by Seller under any Service Contracts.

    (iv)    Seller has full power and authority to enter into this Agreement and to perform and carry out all obligations, covenants and provisions hereof, and upon Closing, Seller will provide an appropriate resolution evidencing the same; the execution, delivery and performance of this Agreement by Seller and the consummation by Seller and of the transactions contemplated hereby have been duly authorized by all requisite action and constitute valid and binding agreements of Seller, enforceable against Seller in accordance with its terms; and neither the execution and delivery of this Agreement by Seller, nor Seller's performance hereof, are restricted by or violate any contractual, legal or other obligation of Seller. Seller further

represents and warrants that the Consent Order is in full force and effect, and that there are no objections of any person or party thereto.

(v)     Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445, and Seller qualifies for an exemption from the withholding requirements set forth therein. Seller shall demonstrate such qualification to Buyer by delivery to Buyer of a Non-Foreign Affidavit as defined by Internal Revenue Code Section 1445 and the Treasury Regulations promulgated thereunder.

(vi)     As of the date of this Agreement, Seller has not received any written notice from any governmental agency, and has no knowledge of violations of any laws or ordinances, rules, regulations, judgments or orders (including, but not limited to, those relating to zoning, condemnation, building, fire, health and safety) in respect of the Property, and has no knowledge that any use made thereof is subject to any action, litigation, proceeding (including condemnation proceedings or any pending proceedings to alter, amend or change the present zoning classification of the Property) or investigation, that have not been resolved.

(vii)     There are currently no leases or other occupancy agreements, liens or security interests against or affecting the Property other than that certain Deed of Trust granted by Seller in favor of Adams National Bank (the "**Adams Deed of Trust**") and there do not exist any rights of first offer or refusals or options to purchase the Property or any portion thereof that have been granted by Seller. In the event that the beneficiary of the Adams Deed of Trust initiates a process to foreclose the lien granted thereunder, Seller shall petition the Court to enjoin same at its sole cost and expense.

(viii)     Seller does not know of any assessments, general or special, which have been levied or are presently pending against the Property or are being contemplated by any taxing authority.

(ix)     The Property is not in violation, nor has it been in violation, of any applicable environmental laws, including with respect to any underground or aboveground storage tanks located on the Property, if any.

(x)     Copies of the Property Documents which have been delivered to Buyer pursuant to the terms of this Agreement are true, correct and complete in all material respects.

(b)     The representations set forth in this Section 6 shall survive the Closing for a period of twelve (12) months.

7.     Affirmative and Negative Covenants of Seller.

(a)     Seller shall, at its sole cost and expense:

(i)     Promptly deliver to Buyer copies of any notice received by Seller after the date of this Agreement regarding all actions, suits, and other proceedings affecting the Property or materially and adversely affecting Seller's ability to convey the Property as set forth hereunder, or the use, possession or occupancy of the Property which may affect Buyer or the

6

DC1 30270710.2

Property, expressly including any such notices or documents in connection with the Proceeding or any objections filed therein (this Section 7(a) shall survive Closing);

(ii)   Pay in the normal course of business, and in any event, prior to the Closing Date, all sums due for work, materials or services furnished or otherwise incurred by Seller in the ownership and operation of the Property up to the Closing Date;

(iii)   Promptly deliver to Buyer after the date of this Agreement notice (including notices given by or on behalf of any Federal, state or local agency) regarding actual or threatened releases of toxic substances or any actual or threatened condemnation of the Property or any portion thereof;

(iv)   Continue to repair and maintain the Property in accordance with the ordinary course of Seller's business and with its past practices, (including but not limited to maintaining all insurance policies that are currently in effect) and shall deliver the Property at Closing in clean, "broom-swept" condition; and

(v)   Present a copy of the proposed Consent Order to Buyer for its reasonable approval prior to filing same with the Court or petitioning for same.

(b)   From the date of this Agreement to the Closing Date or termination hereof, Seller shall not, without the prior written consent of Buyer:

(i)   Enter into any new Service Contracts for the Property that are not terminable without penalty on thirty (30) days written notice;

(ii)   Remove from the Property any Personal Property except as may be necessary for repairs, or the discarding of worn-out or useless items;

(iii)   Grant or transfer or permit the grant or transfer of any lease, occupancy agreement, option, right of first refusal, right of first offer or any other interest in the Property or any portion thereof;

(iv)   Initiate or consent to any zoning change or other action that would change or affect the current zoning classification of the Property or the current permitted uses of the Property; or

(v)   Without Buyer's prior written consent, take any action with respect to the Proceeding or the Consent Order that could have an adverse effect on the Property or Seller's ability to perform its obligations hereunder.

8.   Apportionments.

(a)   The following items shall be apportioned as of 11:59 PM of the day immediately preceding the Closing Date:

(i)   All real and personal property taxes and assessments (except installments of assessments due and payable after the Closing Date) or portions thereof which

7

have become due and payable on or before the Closing Date shall be paid in full by Seller at Closing. All installments of assessments due and payable after the Closing Date shall be paid by Buyer. Current Real estate taxes and personal property taxes shall be apportioned on a tax year basis.

(ii)    If any proceeding for a reduction of the tax assessment of the Property for the year in which the Closing occurs, whether commenced (with Buyer's consent in the event such proceeding is commenced after the date of this Agreement) or concluded before or after Closing, results in a reduction or a refund of any portion of such taxes, the amount of the tax savings or refund, shall be promptly apportioned between Buyer and Seller in accordance with their respective periods of ownership of the Property. Seller agrees that Buyer, at Buyer's election and at its sole cost and expense as set forth below, shall have the right to assume the prosecution of any tax appeal described above which Seller has decided not to pursue; Seller agrees to cooperate with Buyer if Buyer elects to assume the prosecution of any such tax appeal. Buyer shall be responsible for the payment of all attorneys' fees and any other costs in such litigation from and after the date Buyer assumes the prosecution of such litigation (provided, however, in the event such litigation results in a savings allocable to Seller, then Buyer's attorney's fees and other costs shall be appropriately prorated among Seller and Buyer);

(iii)    Charges for utilities, including, without limitation, water, sewer, electricity, steam, gas and telephone; provided that if the consumption of any of such utilities is measured by meters, Seller at the Closing shall furnish a current reading of each meter; and provided, further, that if there is not a meter or if the current bill for any of such utilities has not been issued prior to the Closing Date, the charges therefor shall be adjusted at the Closing on the basis of the charges for the prior period for which bills were issued and shall be further adjusted when the bills for the current period are issued; and

(iv)    All other items of accrued or prepaid income and expense shall be prorated on an accrual basis up to and including the Closing Date on the basis of the most recent ascertainable amounts of, or other reliable information with respect to, each such item of income and expense, and shall be the subject of a final proration statement prepared by Buyer as soon after Closing as the precise amounts of such items can be ascertained, but in all events no later than thirty (30) days after Closing.

(b)    Federal, state and local transfer and recordation taxes, documentary or revenue stamps and similar taxes or charges related to the transfer of the Property or required to be paid to record the deed shall be paid one-half by the Seller and one-half by the Buyer. All escrow charges shall be shared equally by Buyer and Seller. Each party shall pay its own attorney's fees. All mortgage taxes and fees, if any, shall be paid by Buyer. Any and all costs and expenses that are to be incurred as a result or in connection with the Proceeding shall be borne exclusively by Seller.

(c)    The provisions of this Section 8 shall survive the Closing.

9.    Closing Documents.

8

(a)     Prior to or at the Closing, Seller, at its sole cost and expense, shall deliver or cause to be delivered to the Title Company the following, each of which shall be in form and substance in conformity with this Agreement, and sufficient to transfer title to the Property, as required by this Agreement, to Buyer:

(i)     A special warranty deed ("**Deed**"), conveying to Buyer good, marketable and insurable fee simple absolute title to the Property, free and clear of all liens and encumbrances other than Permitted Encumbrances, which Deed shall be in recordable form, duly executed by Seller or the record title holder and acknowledged;

(ii)    A bill of sale without warranty (other than that Seller has not previously conveyed or encumbered its interest, if any) conveying, transferring and selling to Buyer all right, title and interest of Seller in and to all of the Personal Property;

(iii)   An affidavit and such other certificates or affidavits as Buyer may reasonably request in order to establish that Seller is not a foreign person, as defined in Internal Revenue Code Section 1445(b)(2), as amended, and the Treasury Regulations promulgated thereunder;

(iv)    All keys, codes, and passwords to the Property in the possession of Seller;

(v)     A duly executed settlement sheet reflecting the Purchase Price and the agreed adjustments to the Purchase Price;

(vi)    Evidence satisfactory to the Title Company of Seller's authority to execute and deliver the documents necessary to consummate the transaction contemplated hereby, expressly including any and all documents, certificates, affidavits or items required by the Title Company in order to issue the owners policy described in Section 4 (iv) above, and to the extent the execution of any documents by an third party is required in order to obtain same, Seller shall use commercially reasonable efforts to procure same; and all of which shall be at Seller's sole cost, liability and expense; and

(vii)   A certificate certifying to Buyer that all representations and warranties of Seller contained herein are true and correct as of the Closing Date and that all covenants of Seller contained herein have been complied with to the Closing Date.

(b)     Prior to or at the Closing, Buyer, at its sole cost and expense, shall deliver to the Title Company the following, each of which shall be in form and substance in conformity with this Agreement :

(i)     The consideration required pursuant to Section 2, in the amount and form required thereby;

(ii)    A duly executed settlement sheet reflecting the Purchase Price and the agreed adjustments to the Purchase Price; and

9

DC1 30270710.2

(iii)     Evidence of Buyer's authority to execute and deliver the documents necessary to consummate the transactions contemplated hereby.

10.     Brokerage.

(a)     Seller and Buyer each covenant, represent and warrant that it has had no dealings or communications with any broker or agent in connection with the negotiation or consummation of this Agreement, except for Newmark Knight Frank ("**Broker**"). Seller shall pay a commission to Broker upon the Closing in accordance with a separate agreement between Seller and Broker, and Seller and Buyer each covenant and agree to hold harmless and indemnify the other party from and against any and all cost, expense (including reasonable attorneys' fees) or liability for any compensation, commissions or charges claimed by any other broker or agent with whom the indemnifying party dealt with respect to this Agreement or the negotiation thereof.

(b)     The representations set forth in Section 10(a) shall survive the Closing or termination of this Agreement.

11.     Condemnation and Risk of Loss.

(a)     Risk of loss to the Property from fire or other casualty shall be borne by Seller until Closing. If the Property or any portion thereof is damaged or destroyed by fire or other casualty prior to the Closing, Buyer may elect either (i) to terminate this Agreement by written notice to Seller within five (5) calendar days after Buyer has received written notice of such damage or destruction from Seller or (ii) to proceed to Closing, in which event Seller shall assign to Buyer all of Seller's right, title and interest in the insurance proceeds to be paid on the claim of loss plus an amount equal to any deductible in Seller's property and casualty insurance policy. Seller shall cause Buyer to be named as an additional insured or loss payee under Seller's property and casualty insurance policy within five (5) days of the Effective Date. Upon any termination of this Agreement pursuant to this Section 11, Title Company shall promptly return the Deposit to Buyer, and this Agreement shall be deemed null and void and the parties hereto shall have no further obligations to or recourse against each other with regard to the matters provided for herein.

(b)     If prior to the Closing all or any material portion of the Property becomes the subject of a condemnation proceeding by a public or quasi-public authority having the power of eminent domain, Seller shall promptly notify Buyer thereof in writing and either party may elect to terminate this Agreement. If either party elects to terminate this Agreement, it shall so notify the other within ten (10) calendar days after Buyer has received written notice of such proceedings from Seller, and Title Company shall promptly return the Deposit to Buyer, and this Agreement shall be deemed null and void and the parties hereto shall have no further obligations to or recourse against each other with regard to the matters provided for herein. If neither party shall elect to terminate this Agreement as provided in this paragraph, the transaction shall proceed as contemplated herein, in which event Buyer shall be entitled to receive all proceeds of any award or payment in lieu thereof.

12.     Representations and Warranties and Covenants of Buyer.

10

Buyer represents and warrants the following:

Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the Commonwealth of Virginia and has the power and authority to enter into the Agreement and complete the transaction contemplated hereby and the officer executing this Agreement on behalf of Buyer has the power and authority to bind Buyer.

13.   Seller's Default.

If Seller shall default in performance of any of its obligations under this Agreement or shall otherwise breach any representation or warranty hereunder, and fails to cure same within five (5) days of written notice thereof, Buyer's shall be entitled to (i) terminate this Agreement and immediately receive the return of the Deposit or (ii) seek specific performance of this Agreement. Nothing in this Section 13 shall, however, affect Seller's obligations expressly set forth in this Agreement as surviving termination of this Agreement.

14.   Buyer's Default.

(a)   If Buyer shall default in performance of any of its obligations under this Agreement, other than a failure to close which is described in subparagraph (b) hereof, and fails to cure same with five (5) days of written notice thereof, then Seller shall be entitled, as its sole and exclusive remedy to terminate this Agreement and seek to receive reimbursement of all reasonable actual documented third party out-of-pocket costs and expenses incurred by Seller in connection with this Agreement, in an amount not to exceed the amount of the Deposit.

(b)   If Buyer shall fail to close when required under this Agreement, the sole right of Seller shall be to recover, and the sole liability of Buyer shall be to pay, liquidated damages in the amount of the Deposit, such amount being fixed as such by reason of the fact that the actual damages to be suffered by Seller in such event are in their nature uncertain and unascertainable with exactness and because Buyer would not have entered into this Agreement unless Buyer were exculpated from liability except as provided in subparagraph (b) hereof. Seller shall not seek or obtain any money or other judgment against Buyer or any disclosed or undisclosed partner, principal, officer or employee of Buyer or any of the foregoing persons or entities, and Seller's sole recourse for payment of said amounts shall be to the Deposit.

15.   Notices.

All notices, requests, or other communications desired or required to be given under this Agreement shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid or (b) national prepaid overnight delivery service, as follows:

If to Seller:          Ron Joiner
                       Friendship House
                       P. O. Box 15236
                       Washington, DC 20003

With a copy to:        Jeff Sherman, Esquire
                       Jackson & Campbell, PC

DC1 30270710.2

1120 20th Street, N.W.
Washington, DC 20036

and

Lisa Benjamin
Newmark Knight Frank
1152 15th Street, NW
Suite 950
Washington, DC 20005

If to Buyer:        Charles Kehler, Principal
Altus Realty Partners, LLC
4625 Lee Highway, Suite 201
Arlington, Virginia 22207

With copies to:     Adam Walsh, Esquire
Seyfarth Shaw LLP
975 F Street, N.W.
Washington, DC 20004

All notices shall be deemed given when actually received or if earlier, when first refused by or upon first attempted delivery to the party to whom the same is directed. Each party may designate a change of address or supplemental addressee(s) by notice to the other parties, given at least five (5) business days before such change of address is to become effective.

16.     <u>Entire Agreement, Basis of Purchase.</u>

(a)     This Agreement contains all of the terms agreed upon between the parties with respect to the subject matter hereof and supersedes any and all prior written or oral understandings.

(b)     Except as expressly set forth in this Agreement and in the documents to be delivered at Closing, Seller hereby expressly disclaims any and all warranties, express or implied, relating in any way to the Property, including, without limitation, any warranty provided for under statutory or common law or the uniform commercial code, including but not limited to warranties of merchantability and fitness for a particular purpose. Both Buyer and Seller are acting at arm's length to protect their own interests, and both Buyer and Seller shall use their own independent business judgment concerning the sale and purchase of the Property. Buyer has completed or will complete to its satisfaction, all investigations, inspections and tests which Buyer deems necessary in its sole discretion to determine, along with the warranties of Seller set forth herein and in the documents provided at Closing, among other things: (i) the condition of the Property, including, but not limited to, the soil condition of the Property, the existence of any environmental condition, and the existence of patent or latent defects in construction of the Improvements on the Property; (ii) the condition of title to the Property, including, but not limited to, the status of all leases of the Property which have been provided to Buyer for review by Seller; (iii) the status of all building code, zoning and other applicable governmental

12

requirements of whatever kind regarding the Property or any intended use of the Property, including, without limitation, the status of any permit, application, license, approval, certificate or other intangible right of whatever kind regarding the Property; and (iv) the status and effect of all recorded covenants and restrictions relating to the Property, it being agreed as set forth above that Seller shall give no warranty and make no representation regarding such matters, except as set forth herein and in the documents provided at Closing.  Buyer acknowledges that it agrees to accept conveyance of the Property at Closing in its "as-is, where-is" condition as of the Closing Date, solely based upon its reliance on its own investigations, inspections and judgment, and the representations and warranties of Seller provided herein and in the documents provided at Closing.

17.    Complete Agreement; Amendments.

This Agreement constitutes the entire agreement between the parties respecting the transactions contemplated hereby and the subject matter hereof, and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, express or implied, are merged herein and superseded hereby.  This Agreement may not be changed, modified or terminated except by a written instrument executed by the parties hereto.

18.    Waiver.

No waiver by either party of any failure or refusal of the other party to comply with any of its obligations shall be deemed a waiver of any other or subsequent failure or refusal so to comply.

19.    Successors and Assigns.

(a)    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(b)    Buyer may assign this Agreement to one or more parties without the prior written consent of Seller so long as Buyer has a direct or indirect ownership interest in such assignee.  Buyer shall promptly notify Seller of any such assignment.

20.    Section Headings.

The headings of the various Sections of this Agreement have been inserted only for the purpose of convenience, and are not part of this Agreement and shall not be deemed in any manner to modify, explain, qualify or restrict any of the provisions of this Agreement.

21.    Interpretation.

Whenever the context hereof shall so require, the singular shall include the plural, the male gender shall include the female gender and neuter and vice versa.  This Agreement and any related instruments shall not be construed more strictly against one party than against the other by virtue of the fact that initial drafts were made and prepared by counsel for one of the parties, it being recognized that this Agreement and any related instruments are the product of extensive

13

negotiations between the parties hereto and that both parties hereto have contributed substantially and materially to the final preparation of this Agreement and all related instruments.

22.   Governing Law.

THIS AGREEMENT SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE DISTRICT OF COLUMBIA WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.

23.   Waiver of Jury Trial.

IT IS MUTUALLY AGREED BY AND BETWEEN SELLER AND BUYER THAT THE RESPECTIVE PARTIES HERETO SHALL AND DO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.   EACH PARTY ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THIS WAIVER AND HAS BEEN ADVISED BY COUNSEL AS NECESSARY OR APPROPRIATE.   THIS WAIVER IS MADE KNOWINGLY AND VOLUNTARILY BY THE PARTIES HERETO.

The provisions of this Section 23 shall survive the Closing and the termination of this Agreement.

24.   Counterparts.

This Agreement may be signed in one or more counterparts, each of which will constitute an original and all of which shall comprise the entire Agreement.

25.   Partial Invalidity.

Any provision of this Agreement, or the application of any provision hereof to any person or circumstance, which is finally determined by a court of competent jurisdiction to be unenforceable, invalid or illegal shall be of no force or effect, but each remaining provision of this Agreement, and the application thereof to all other persons and circumstances shall remain fully valid and enforceable as written.

26.   No Personal Liability of Members, Officers or Directors.

Buyer acknowledges that this Agreement is entered into by a corporation as Seller, and Seller acknowledges that this Agreement is entered into by a limited liability company as Buyer. Buyer and Seller agree that no individual member, officer, director, agent, employee or representative of Buyer or its designee at Closing, or Seller, or of any of their constituent or affiliated entities, shall have any personal liability under, arising out of, or in connection with this Agreement, any document executed pursuant to this Agreement, or in connection with any transaction contemplated by this Agreement.

27.   Third Parties.

14

Nothing in this Agreement is intended to confer upon any person or entity, other than the parties hereto and their respective successors and permitted assigns, any rights or remedies under, arising out of, or by reason of this Agreement.

28. Terrorist Financing and Money Laundering.

Seller and Buyer hereby covenant, warrant, and represent to each other that they are not, and will not become at any time through the Closing Date, as the same may be extended: (a) a Blocked Person (as defined below); or (b) directly owned, in whole or in part, or directly controlled by any Blocked Person with an ownership or control interest in excess of twenty-five percent (25%). Seller and Buyer further covenant, warrant and represent that they do not, and will not at any time through the date of Settlement: (1) knowingly conduct any business or knowingly engage in any transaction or dealing with a Blocked Person; or (2) knowingly deal in, or otherwise knowingly engage in any transaction or dealing relating to any property, or interests in property, blocked pursuant to Executive Order 13224, as amended (as defined below). For the purposes of this Section 28, "Blocked Person" is defined as any person or entity listed by the Treasury's Office of Foreign Assets Control ("OFAC") on the so-called "Specially Designated Nationals and Blocked Persons" list or any other list of blocked persons or entities published by OFAC, as any or all of the such list(s) may be updated, amended, modified or supplemented from time to time. For the purposes of this Section 28, "Executive Order 13224" is defined as Executive Order Number 13224, "Blocking Property Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism," at 66 Fed. Reg. 49079 (Sept. 23, 2001), as the same may be amended from time to time.

29. Exclusivity.

Seller agrees not to enter into any binding contract for the sale of the Property with any other party until the earlier to occur of (i) Closing or (ii) the termination of this Agreement as permitted herein.

30. Business Days.

Business days shall mean any day other than (i) Saturday, (ii) Sunday or a day on which business is not transacted by banks in the District of Columbia. If any date upon which action is required under this Agreement shall not be a business day, the date for such action shall be extended to the first business day after such date.

31. UNDERGROUND STORAGE TANK DISCLOSURE. In accordance with the requirements of the D.C. Underground Storage Tank Management Act of 1990, as amended by the District of Columbia Underground Storage Tank Management Act of 1990 Amendment Act of 1992 (D.C. Code 8-113.01 et seq.) (the "Act") and the D.C. Underground Storage Tank Regulations, 20 DCMR Chapters 55-70 (the "Regulations"), Seller hereby informs Buyer that Seller has no knowledge of the existence or removal during Seller's ownership of the Property of any "underground storage tanks" as that term is defined in the Act and the Regulations. Information pertaining to underground storage tanks and underground storage tank removals of which the D.C. Government has received notification is on file with the D.C. Department of Consumer and Regulatory Affairs, Environmental Regulation Administration, Underground

DC1 30270710.2

Storage Tank Branch, 2100 Martin Luther King, Jr. Avenue, S.E., Washington, D.C., telephone (202) 404-1167.

32.    <u>DISTRICT OF COLUMBIA SOIL DISCLOSURE</u>.  Buyer confirms that Seller has advised it, pursuant to Title 42, Section 608 of the District of Columbia Code, that the soil on the subject lands is noted in the Soil Survey of the District of Columbia as Urban Land, with the following characteristics: "_____." Buyer has been advised that it may obtain further information in this regard by engaging a soil testing laboratory, the D.C. Department of Environmental Services, or the Soil Conservation Service of the U.S. Department of Agriculture. Nothing herein shall constitute a representation or warranty by the Seller as to the soil characteristics of the subject property.

33.    <u>Effective Date</u>.  The "**Effective Date**" shall be the date that a fully executed copy of the Consent Order (in the form approved by Buyer in writing ) has been executed and issued by the Court and such executed and issued Consent Order has been delivered to Buyer.  If Effective Date has not occurred by February 19, 2010, at Buyer's election, Buyer may terminate this Agreement and upon such termination Seller shall return to Buyer all executed copies of this Agreement.

<u>[SIGNATURES APPEAR ON FOLLOWING PAGE]</u>

16

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the Effective Date.

SELLER:

FRIENDSHIP HOUSE ASSOCIATION, INC.

By: _____

Print Name: _Ronald V. Jones_

Title: _Chairman, of Board of Directors_

Dated: _2/5/10_

BUYER:

ALTUS REALTY PARTNERS, LLC

By: _____

Print Name:_____

Title: _____

Dated: _____

DCI 30270710.2

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the Effective Date.

SELLER:

FRIENDSHIP HOUSE ASSOCIATION, INC.

By:_____
Print Name:_____
Title: _____

Dated: _____


BUYER:

ALTUS REALTY PARTNERS, LLC

By:_____
Print Name: Charles H. Kehler_____
Title: Principal_____

Dated: _____

DC1 30270710.2

# EXHIBITS

A.    Legal Description

B.    Personal Property

C.    Escrow Agreement

D.    Consent Order

# EXHIBIT A

## Legal Description

## **EXHIBIT B**

Personal Property
[ATTACH SCHEDULE]

NONE

## EXHIBIT C

Escrow Agreement

This Escrow Agreement (hereinafter this "**Agreement**") made this _____ day of February, 2010 by and among, **FRIENDSHIP HOUSE ASSOCIATION, INC.** ("Seller"), **ALTUS REALTY PARTNERS, LLC,** a Virginia limited liability company ("Buyer") and **OLD REPUBLIC NATIONAL COMMERCIAL TITLE SERVICES** ("Escrow Agent").

### WITNESSETH:

WHEREAS, Seller and Buyer have entered into an Agreement of Sale ("**Purchase Agreement**") dated February, 2010, whereby Seller has agreed to sell and Buyer has agreed to purchase certain property identified therein;

WHEREAS, pursuant to the Purchase Agreement, Buyer and Seller have agreed to place a portion of the purchase money in escrow;

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound hereby, agree as follows:

1.      The foregoing recitals are incorporated herein and made a part hereof.

2.      Buyer hereby deposits with Escrow Agent the sum of **Eighty Five Thousand and 00/100 Dollars ($85,000.00)** ("**Deposit**"), which Escrow Agent acknowledges receipt of, to be held and disbursed in accordance with the terms of this Agreement.

3.      Escrow Agent shall hold the Deposit in an interest bearing money market savings.

4.      Escrow Agent shall disburse the escrowed funds, together with accrued interest, if any, as set forth in the Purchase Agreement.

5.      In the event of any doubt or uncertainty by Escrow Agent as to the propriety of disbursing the escrowed funds, the Escrow Agent may retain the funds, without penalty or liability, until the parties provide joint written instructions for the disbursement of the funds or until a final adjudication is made as to their proper disposition. In this regard, Escrow Agent shall be entitled to rely absolutely on the advice of its counsel.

6.      Escrow Agent shall receive no compensation for entering into this agreement; however, it shall be entitled to the following reimburse for bookkeeping expenses: (1) If the Escrow is disbursed within six (6) months of the date of this Agreement, the sum of $25.00; (2) If the Escrow is disbursed after six (6) months from the date of this agreement, the sum of $25.00 shall be made for each year beyond the initial six (6) month period in which the funds are held.

7.      Escrow agent herein is acting solely as a stakeholder for the purpose of accommodating the other parties to this Agreement. It has no interest whatsoever in the escrowed funds. It shall be under no duty to defend the funds from attack by third parties or

DC1 30270710.2

otherwise, except that it shall give prompt notice to the other parties in the event of any such claim or attack. The other parties to this agreement agree to indemnify and hold Escrow Agent harmless from any loss or damage, including reasonable attorney's fees (including reasonable charges attributable to work done by Escrow Agent's in-house counsel) which Escrow Agent may suffer or incur, as a result of its activities in holding this escrow; provided, however, that nothing herein shall be deemed to relieve Escrow Agent from acts of negligence or misconduct.

## SIGNATURE LINES ON NEXT PAGE

SELLER:

FRIENDSHIP ASSOCIATION, INC.


By:_____
Print Name:_____
Title: _____


BUYER:

ALTUS REALTY PARTNERS, LLC


By: _____
Print Name:_____
Title: _____


ESCROW AGENT:

OLD REPUBLIC NATIONAL COMMERCIAL
TITLE SERVICES


By:_____
Name:_____
Title:_____

## **EXHIBIT D**

Consent Order
[To Be Attached Upon Issuance]